# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOHN ANDERSON, as special administrator of the ESTATE OF PAUL LICKERMAN, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) No. 01 C 9695<br>) |
| UNITED STATES OF AMERICA, | ) Judge Nan R. Nolan<br>) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Paul Lickerman, a veteran of the United States Army, received medical treatment at the Edward Hines, Jr. VA Hospital in Hines, Illinois after he fell and broke his hip on March 23, 1999. Lickerman filed suit against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.*, alleging that the doctors, nurses, and other staff members at Hines VA failed to detect that he had also fractured his wrist, resulting in two surgical repair procedures, a lengthy recovery period, and undue pain and suffering. The United States insists that Lickerman had no such wrist fracture when he presented at the VA Hospital, and that the medical staff treated him within the appropriate standard of care.

Lickerman died of unrelated causes on July 16, 2004. At that time, John Anderson, Lickerman's son and special administrator of the Estate of Paul Lickerman, became the named Plaintiff in this case. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The court held a bench trial to resolve this dispute and, for the reasons explained below, concludes that Plaintiff has not met his burden of establishing that the VA Hospital staff acted negligently in caring for Lickerman's wrist, or proximately caused his wrist injury.

## BACKGROUND

Lickerman was born in 1933 and served in the U.S. Army from 1955 to 1958 before being honorably discharged. (Tr. 14, 19; Lickerman Dep., 5-6.) He had two children, Jennifer McGrath and John Anderson, and was divorced. Lickerman lived with McGrath in Woodridge, Illinois from approximately 1991 until 1992 or 1993, when he went to live with Anderson and Anderson's long-time girlfriend, Anna Parker, in Lyons, Illinois. In 1997 or 1998, Anderson moved the family to Burr Ridge, Illinois, where Lickerman occupied a basement bedroom. (Tr. 30, 57, 125.) Around the time of the move, Lickerman, then 61 years old, stopped driving a car due to poor eyesight and retired from his position as a factory security officer. (Tr. 90; Lickerman Dep., at 46-47.) Lickerman had an extensive history of alcohol abuse, and by March of 1999 he was drinking a pint to a quart of vodka and several beers each day. (Tabs 1, 4, 5; Lickerman Dep., at 5, 13-17.) At that time, Lickerman spent most of his time drinking, watching television, taking occasional short walks, and sleeping. (Tr. 88, 121, 126.)

### A. Lickerman's March 23, 1999 Fall

On March 23, 1999, Lickerman fell onto the concrete floor of his basement bedroom. (Tr. 88.) When the Burr Ridge police arrived, Parker told them that she had found Lickerman lying on the bedroom floor complaining of hip and lower back pain. Parker explained that Lickerman was intoxicated the previous night and could not move. (Tab 1; Tr. 564-66.) Paramedics arrived around the same time as the police and noted that Lickerman rated his hip pain a "10." Lickerman did not mention any pain or injury to his left wrist, and also denied having back pain. (Tab 3; Tr. 566-67.)

### B. Lickerman's Admission to Hines VA

The paramedics transported Lickerman by ambulance to Hines VA Hospital, where emergency room staff examined him and recorded complaints of left hip pain. The emergency

2

room records reflect that Lickerman also had tenderness in his left wrist, but that there was no deformity or edema (swelling). (Tab 4; Tr. 567-71.) Later in the day on March 23, 1999, Lickerman was admitted to Hines VA for a hip fracture resulting from his fall. Upon admission, a VA nurse conducted an admission assessment documenting severe pain in Lickerman's left hip, but making no mention of any left wrist symptoms. The nurse designated Lickerman a "fall risk" due to various factors such as his age, fall history, mobility, generalized weakness, substance abuse, and medication. (Tab 5; Tr. 571-74.) Lickerman was also evaluated by a physician who noted complaints of severe left hip pain; again, Lickerman made no complaints of wrist pain. (Tab 6; Tr. 574-75.)

Throughout Lickerman's stay at Hines VA, the hospital maintained a Basic Care 24 Hour Nursing Flow Sheet ("nursing flow sheet") documenting his condition and care. The March 23, 1999 nursing flow sheet reflects that Lickerman had "a weak left upper extremity." (Tab 7, at 568; Villanueva Dep., at 32-34.) On March 24, 1999, Lickerman reported pain in his left wrist at a level of 3 or 4 out of a possible 5, and left hip pain ranging from a level of 2 to 4. Nurse Carolina Cordero and Nurse Sabrina Sykes separately noted edema at both sites and gave him pain medication. (Tab 7, at 570; Cordero Dep., at 21-22.) The next day, Nurse Cordero and Nurse Sykes continued to note left wrist pain ranging from a level of 2 to 5, and left hip pain ranging from a level of 3 to 5. The nurses noted edema at both sites and a weak hand, and again gave Lickerman pain medication. (Tab 7, at 572; Tr. 171.) On March 26, 1999, the nursing flow sheet documents pain in Lickerman's "left hand" but no edema. (Tab 7, at 574.)

By March 27, 1999, Lickerman was becoming increasingly uncooperative, most likely due to conditions related to his alcohol abuse. Specifically, Lickerman suffered from Wernicke-Korsakoff syndrome, a type of dementia related to extended alcohol use, and he was experiencing delirium tremens from alcohol withdrawal. As a result, Lickerman kept trying to get out of bed and pull out his IV lines and tubes, and he was unable to follow instructions or maintain placement in

a bed or chair. Lickerman's mental state and hip injury put him at an elevated risk of hurting himself and, thus, the Hines VA medical staff determined that he should be placed in wrist restraints and a restraining vest beginning March 26 or 27, 1999. (Tab 8; Tab 6, at 1158, 1170, 1181, 1182, 1189, 1194, 1228, 1258; Tr. 179-80, 585-86.) Anna Parker testified that she actually saw Lickerman in restraints a few days earlier, on March 23 or 24, 1999. (Tr. 94.) In any event, pursuant to VA policy, a nurse checked Lickerman's wrist restraints every shift by placing her fingers under the restraints to ensure proper positioning, circulation, and skin condition. The Daily Protective Device Flow Sheets documenting this care regimen make no mention of any left wrist pain, swelling, deformity, or instability. (Tab 8, 11; Tr. 586-90.)

## C. Lickerman's Hip Surgery and Early Rehabilitation

On April 6, 1999, Lickerman had surgery to repair his broken hip. Lickerman received general anaesthesia for the procedure, which required a surgical nurse to place an IV in his left arm. In addition, during the surgery, an anaesthesiologist inspected and monitored the IV site. None of the medical records relating to the operation document any complaints or concerns regarding left wrist pain, deformity, or swelling. (Tab 6, at 1208; Tab 10, at 1299; Tr. 591-93.)

Three days after the surgery, on April 9, 1999, VA kinesiotherapist Michael Sullivan conducted active assist range of motion exercises on Lickerman's upper and lower extremities. This required Sullivan to hold Lickerman's wrist and assist him in raising his arms to check for shoulder and elbow flexion and elbow extension. Sullivan reported that Lickerman complained of pain with respect to his left hip, but did not record any pain complaints relating to his wrist. (Tab 6, at 1222; Tr. 265-75.) Sullivan conducted similar exercises with Lickerman on April 12, and on April 13, Lickerman was able to stand with "moderate assist and using a pick-up walker for support." Sullivan explained that he held Lickerman under his arms to help him stand up, but that Lickerman had to hold onto the bars of the walker and put some weight on his hands and wrists

4

in the process. (Tab 6, at 1234, 1235, 1251, 1265; Tr. 275-81.) Sullivan worked with Lickerman again on April 16 and 19, 1999 with respect to "sitting balance." For this exercise, Lickerman would get into a sitting position and then support himself with his hands by his sides for balance. Lickerman refused to attempt any walking exercises due to his left hip pain. (Tab 6, at 1251, 1265; Tr. 288-90, 295-96.)

At trial, Sullivan could not recall treating any patients with a broken wrist, and he had no specific recollection of Lickerman. He did, however, testify that Lickerman complained of pain when he attempted to take a step, and not when he placed his hands on the walker. (Tr. 260-61, 298, 311-12.)

### D. Lickerman's Stay at Briar Place

On April 20, 1999, Lickerman was discharged from Hines VA and transported to Briar Place Nursing Center in Countryside, Illinois. The discharge summary documented many of the medical issues Lickerman faced during his four-week hospital stay, including possible pneumonia, a suspicious mass in his chest, several fever spikes, alcohol withdrawal, and a refusal to eat for a week. (Tab 9.) Plaintiff does not claim any negligence relating to the length of Lickerman's stay at Hines VA.

During the transport to Briar Place, Lickerman was combative and thrashing about. (Tr. 604-05.) Nevertheless, Lickerman's pre-admission medical assessment upon arriving at Briar Place noted a hip fracture but no left wrist injury, pain, swelling, or deformity. (Tab 12.) On April 21, 1999, Dr. B.G. Shreenivas, the Medical Director/Advisor for Briar Place specializing in internal medicine, examined Lickerman for approximately 40 to 45 minutes. The exam was designed in part to evaluate Lickerman's upper body strength for purposes of rehabilitation. At that time, Dr. Shreenivas noted Lickerman's upper extremity strength was 5 out of 5. (Tab 14; Tr. 605-07; Shreenivas Dep., at 16, 18-22, 43, 70, 75-77.) The next day, a Briar Place therapist conducted an

Occupational Therapy Evaluation, asking Lickerman to extend and flex his wrist, and to grip something to test his wrist functions. The therapist noted that Lickerman's strength and range of motion for both wrists was normal, and recommended that he begin pulley exercises with one and one-half-pound wrist weights. (Tab 15; Tr. 607-11.)

Also on April 22, 1999, a Briar Place therapist conducted a Grooming/Bathing Skills Evaluation to assess Lickerman's ability to engage in various activities of daily living, such as washing his face and upper body, shaving, removing his shoes and socks, buckling and unbuckling his belt, and pulling garments over his head. After observing Lickerman perform these tasks, the therapist did not note any problems or complaints regarding his left wrist. (Tab 16, 17; Tr. 611-13.) To the contrary, Lickerman's Physical Rehabilitation Care Plan included the goal of ambulating with a rolling walker three times per week. (Tab 18.) The next day, on April 23, 1999, Briar Place conducted an Activity Assessment for Skilled Care Resident, repeatedly noting that Lickerman had use of both hands and recording no related injury, swelling, deformity, or pain. The nursing home also performed a Social Service Assessment, finding Lickerman able to coherently verbalize his wants and needs. (Tab 20, 21, 22; Tr. 613-17.)

In addition to these specific evaluations, the Briar Place nursing notes from April 20 to 24, 1999 document that Lickerman complained of left hip pain and discomfort, but none of the nurses noted any left wrist complaints or problems. (Tab 23, at 431-32.) Jennifer McGrath nonetheless claims that when she visited her father in the first day or two after he arrived at Briar Place, Lickerman showed her his left arm and it was swollen with a bone sticking out. (Tr. 35.) Anna Parker similarly testified that Lickerman's wrist was distorted and that he complained about the pain, but that no one at Briar Place would look at his wrist. (Tr. 98-99, 136-37.)

### E. Lickerman's Wrist Fracture

It is not clear what transpired with Lickerman between April 25 and May 5, 1999. Significantly, the Briar Place nursing notes for this 11-day period are completely blank despite his admission for rehabilitation following hip surgery. (Tab 23; Tr. 620-21.) There is also a 10-day period between April 25 and May 4, 1999 when the Briar Place Nursing and New Orders sheets are similarly blank. At the end of the April 24, 1999 entry on page "4" of the new orders sheet, there is a large "X" drawn. The next entry, on May 4, 1999, appears on a new sheet that restarts the numbering at page "1." (Tab 24; Tr. 473-74.) The only record of Lickerman's condition during this period is an April 28, 1999 Range of Motion Evaluation that found substantially diminished left wrist flexion and no extension. (Tab 25.)

Despite this wrist assessment, there does not appear to be any response from Briar Place. Indeed, the next notation regarding Lickerman's condition is on May 6, 1999, when VA community nurse Joan Swiebocki happened to be visiting Briar Place to evaluate it as a nursing home that was under contract with the VA. Nurse Swiebocki stopped in to meet Lickerman and though he did not appear to be in "acute distress," he did complain to her of left wrist pain. She noted, and recorded in all capital letters, that his "forearm does look swollen and their [sic] is a deformity at the wrist." Nurse Swiebocki also indicated her concern that no one at Briar Place knew when the problem began: "Veteran is forgetful and not a good historian so I am not sure how long he has had the edema and wrist deformity. Staff not certain either!" (Tab 6, at 292-93; Swiebocki Dep., at 4-16, 34, 36.) After Nurse Swiebocki reported her findings to Briar Place, Dr. Shreenivas examined Lickerman's wrist and noted a "fork deformity." His progress note for that date further stated: "Complains of pain left wrist. ? [question mark] two weeks." (Tab 27; Shreenivas Dep., at 44-45.)

An x-ray of Lickerman's wrist taken on May 6, 1999 revealed a comminuted, impacted, intra-articular, volarly displaced fracture of the distal radius. (Tab 28; Tr. 639-40.) On May 7, an

7

ambulance transported Lickerman back to Hines VA, where he had a second set of wrist x-rays taken. Lickerman was also examined by Dr. Stanley Lee, who noted that Lickerman's left wrist was "grossly unstable" and placed it in a cast. (Tab 6, at 292; Lee Dep., at 21-25, 32.) Lickerman returned to Briar Place and, a few days later on May 11, 1999, a Nurses' Note stated that Lickerman was more alert and that he had told four different nurses that he injured his arm at the VA hospital. No one at Briar Place, however, has admitted either to writing that note or to being one of the four nurses who spoke with Lickerman. (Tab 23, at 437; Tr. 517.) On May 26, 1999, VA physician Dr. Omar Darr examined Lickerman's wrist and stated that the fracture was approximately six weeks old. This assessment, however, was based solely on reports from Lickerman, who is an admittedly unreliable historian. (Darr Dep., at 18.) (See infra pp. 11-12.)

F. **Lickerman's Wrist Treatment**

Lickerman ultimately needed two corrective surgical procedures to repair his wrist. Dr. Michael Bednar performed the first procedure on January 21, 2000, which involved placing a metal wrist fusion plate on the back of Lickerman's hand and wrist to help keep it in position for healing. (Lee Dep., at 32; Bednar Dep., at 10-11.) For the second procedure on August 11, 2000, Dr. Bednar removed the metal plate and screws. (Id. at 19.) Plaintiff does not claim negligence with respect to the performance of these surgeries. He does argue, however, that Lickerman suffered reduced range of motion in his hand as a result of the delay in detecting the fracture, as well as a lengthy 17-month period of total disability. The United States notes that Lickerman had no limitations on his activities of daily living as a result of the reduced range of motion, that he suffered no sensory deficit or numbness, and that he had good grip strength. (Tr. 505-06, 512; Lickerman Dep., at 37-38.) The United States also disputes that it failed to detect the fracture in a timely manner.

### G. The Expert Testimony

Both parties presented expert testimony regarding when Lickerman suffered the wrist injury. Plaintiff's expert, Dr. Kenneth Sanders, is an orthopaedic surgeon with the Glen Ellyn Clinic Orthopaedic Department who specializes in sports medicine and has treated thousands of wrist fractures. Dr. Sanders is a member of the DuPage County Medical Society, the American Academy of Orthopaedic Surgeons, the American Medical Association, the Lincoln Orthopaedic Society, and the Illinois State Medical Society. (Tr. 325-29; PX 11.)

In his first report dated December 11, 2002, Dr. Sanders stated that Lickerman injured his wrist when he fell on March 23, 1999, and that it went undiagnosed until May 6, 1999. In support of this conclusion, Dr. Sanders noted that Lickerman exhibited pain, swelling, and weakness in his left wrist during his first four days at Hines VA. In Dr. Sanders' view, these symptoms alone mandated that Hines VA order an x-ray of the wrist to determine if it was fractured. (Tr. 338.) At trial, Dr. Sanders testified that if Hines VA had discovered the wrist fracture on March 23, 1999, the proper course of treatment would have been to perform a "reduction" to position the bones following manipulation of the fracture. (Tr. 367-68.) Dr. Sanders later speculated on cross-examination, however, that there may not in fact have been a displacement of the fracture, or the need for a reduction, on March 23. Instead, Lickerman may have displaced the fracture at a later date by being uncooperative and thrashing around as he did while in restraints at the VA and during transport to Briar Place. (Tr. 401-02, 436-37, 532.)

In his December 11, 2002 report, Dr. Sanders further opined that the wrist fracture was "very likely greater than four weeks old" based on the May 6 x-ray, which showed "osteopenia around the fracture area as well as . . . cyst formation noted at the end of the radius at the fracture area." (Tab 35.) At his subsequent deposition and at trial, Dr. Sanders added that Lickerman's x-ray showed significant callus formation, resorption of the bone, and smooth edges on the bone at

9

the fracture site, all of which appear in older fractures that have started to heal. (Tr. 350-54, 530-32, 485-87.) In reaching this conclusion, Dr. Sanders did not review any deposition transcripts and did not even know who VA kinesiotherapist Michael Sullivan was. By the time of trial, Dr. Sanders still had not read the depositions of Nurse Swiebocki, Lickerman, John Anderson, or Anna Parker. (Tr. 502-03.) As a result, Dr. Sanders never knew that Nurse Swiebocki had found substantial swelling in Lickerman's wrist on May 6, 1999. Dr. Sanders was also unaware of the VA nurses' notations regarding Lickerman's mental state and alertness, or the fact that Lickerman had an IV in his left arm during his hip surgery. (Tr. 407-08, 438-39, 502-03.)

The United States relied on the expert testimony of Dr. Mark Hutchinson, an orthopaedic surgeon and the Head Team Physician at the University of Illinois at Chicago. Dr. Hutchinson is an Associate Professor of Orthopaedics and Sports Medicine and the Medical Director of UIC Sports Medicine and Human Performance Center. Dr. Hutchinson serves on numerous medical boards, including the Board of Trustees of the American College of Sports Medicine; he is the founder and past president of the Chicago Sports Medicine Society; and he is a fellow in the American Academy of Orthopaedic Surgeons. Dr. Hutchinson serves as master instructor for a number of courses offered by the Arthroscopy Association of North America and specifically teaches residents regarding the different phases of fracture healing. He has also published extensively, received several research grants, and has treated hundreds of fractured wrists. (Tab 34; Tr. 553, 555-56.)

Dr. Hutchinson issued his report on August 10, 2003 after reviewing all of the deposition transcripts and medical records.[1] (Tab 33.) In Dr. Hutchinson's opinion, Lickerman probably sustained a sprain, strain, or bruise to his left wrist on March 23, 1999, but not a fracture.

---

[1] The only exception is the deposition of Dr. Michael Bednar because Dr. Hutchinson's copy was missing every other page due to a copying error. Dr. Hutchinson subsequently reviewed the entire transcript, however, by the time of trial.

10

According to Dr. Hutchinson, this would explain the swelling, pain, and tenderness in Lickerman's wrist upon his arrival at Hines VA, but the absence of any complaints of pain thereafter. Dr. Hutchinson notes that notwithstanding any pain medication and Lickerman's waxing and waning mental state, he regularly voiced complaints about hip pain long after he stopped complaining about left wrist pain. (Tr. 561-64, 572, 581-83.) In Dr. Hutchinson's view, the appropriate course of treatment was to wait and watch the wrist, particularly since Lickerman would be under continuing hospital care for his hip and could easily be observed. (Tr. 568-69.)

With respect to Lickerman's May 6, 1999 x-ray, Dr. Hutchinson noted in his August 10, 2003 report (issued before Dr. Sanders' deposition) that there was little or no callus formation. At trial, Dr. Hutchinson testified that the area on the x-ray Dr. Sanders described as callus was actually just crushed bone. He explained that in elderly patients like Lickerman with weakened bones, the breaks are not clean but, rather, "crushe[d] like potato chips." (Tr. 645-46.) Dr. Hutchinson further noted that Dr. Bednar saw "no or minimal" callus formation or healing, and that Dr. Lee similarly saw no signs of healing in the fracture area. Dr. Hutchinson agreed with Dr. Sanders that there was some bone resorption, but opined that the level was normal for a fracture that was two to three weeks old. (Tr. 647-48; Bednar Dep., at 30; Lee Dep., at 33-34.)

### H. Lickerman's Testimony

Both parties acknowledge that Lickerman was a poor historian and that his testimony is not completely reliable due to his Wernicke-Korsakoff syndrome, medication, and history of alcohol abuse. (Tr. 470-71.) Nevertheless, Plaintiff emphasizes Lickerman's deposition testimony that he experienced left wrist pain at Hines VA that continued after March 26, 1999 while he was restrained. (Lickerman Dep., at 30-31, 33.) Plaintiff also notes Jennifer McGrath's testimony that when she saw Lickerman a day or two after he arrived at Briar Place, he said that he had been trying to tell the VA, the ambulance workers, and the Briar Place nurses that he had a problem with

his wrist, but "they just kind of blew it off." (Tr. 36.) Plaintiff finally notes that Lickerman testified at his deposition that he never fell in the nursing home. (Lickerman Dep., at 34.) The United States similarly finds it significant that on May 6, 1999, Lickerman told Dr. Shreenivas, the ambulance paramedics, and Dr. Lee that he had injured his wrist in a fall approximately two weeks earlier, around April 23 or 24, 1999. (Tab 27; Tab 30; Tab 6, at 292.) The United States also points to Lickerman's deposition testimony that he had no complaints about Hines VA's treatment during March and April 1999. (Lickerman Dep., at 43-44.) Based on a thorough review of the relevant documents, deposition transcripts, and trial testimony, the court finds that Lickerman was consistently capable of reporting his level and areas of pain and discomfort, but that he was not a reliable source regarding dates, times, and events.

I. **Lickerman's Lawsuit**

On December 3, 1999, Lickerman submitted a Claim for Damage, Injury, or Death to Hines VA, alleging that the hospital staff failed to treat his fractured wrist beginning March 23, 1999. (Ex. A to Cmplt.) On May 2, 2000, the Department of Veterans Affairs acknowledged receipt of Lickerman's claim and requested some additional information. (Ex. B to Cmplt.) Also on May 2, 2000, Lickerman filed a negligence claim against Briar Place in the Circuit Court of Cook County, Illinois. A little more than one year later, on July 10, 2001, the Department of Veterans Affairs denied Lickerman's negligence claim against the hospital. (Ex. C to Cmplt.) Lickerman filed suit against the United States in federal court on December 19, 2001, alleging that Hines VA was negligent in failing to diagnose and treat his fractured wrist on March 23, 1999. On May 17, 2002, the United States filed a third-party complaint against Briar Place alleging that the nursing home was the negligent party. On February 6, 2003, the district court removed Lickerman's state court case against Briar Place to federal court and consolidated it with the federal suit.

On November 12, 2003, the district court approved a settlement resolving the claims against Briar Place and leaving the United States as the sole remaining defendant. Lickerman subsequently died of unrelated causes on July 16, 2004. At that time, John Anderson became the named Plaintiff in this case. On September 14, 2004, the parties consented to the jurisdiction of the United States Magistrate Judge. This court held a bench trial on May 16, 17, 18, and 20, 2005, and both parties now seek judgment in their favor.

## DISCUSSION

The FTCA provides a limited waiver of the federal government's sovereign immunity by "grant[ing] federal courts jurisdiction over damages claims against the United States 'for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . .'" *Alinsky v. United States*, 415 F.3d 639, 643 (7th Cir. 2005) (quoting 28 U.S.C. § 1346(b)). In determining whether an act or omission constitutes the basis of a suit under the FTCA, the court must look to the law of the state in which it occurred. *LM ex rel. KM v. United States*, 344 F.3d 695, 700 (7th Cir. 2003). In this case, both parties agree that Illinois substantive law applies.

To prove a claim of medical malpractice under Illinois law, Plaintiff must establish: (1) the proper standard of care by which a physician's conduct may be measured; (2) a negligent failure to comply with the applicable standard; and (3) a resulting injury proximately caused by the physician's lack of skill or care. *Massey v. United States*, 312 F.3d 272, 280 (7th Cir. 2002) (quoting *Donais v. United States*, 232 F.3d 595, 598 (7th Cir. 2000)). "Unless the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care and the defendant physician's deviation from that standard." *Id.* (quoting *Donais*, 232 F.3d at 598).

Plaintiff argues that he has established negligence in this case by proving within a reasonable degree of medical certainty that Lickerman's left wrist fracture occurred prior to or during his stay at Hines VA Hospital. Plaintiff notes that between March 23 and 26, 1999, Lickerman complained of pain at a level of 2 to 5 out of 5 in his left wrist and exhibited related swelling and tenderness. Nurse Sykes testified that pain, weakness, and swelling are "three good indicators" of a fractured wrist, and that people with a fractured wrist often complain of pain at a level of 3 to 5 out of 5. (Tr. 197, 212.) Plaintiff's expert, Dr. Sanders, further testified that the standard of care for a patient presenting with the above symptoms is to take an x-ray. Plaintiff observes that Hines VA did not even provide the minimal care suggested by the United States' expert, Dr. Hutchinson – i.e., ice, elevation, and Tylenol. (Tr. 582.)

The United States responds that Lickerman's subsequent medical condition belies the existence of a fracture during his stay at Hines VA. The court agrees. Between March 26 and April 20, 1999, the medical records reflect that Lickerman continued to make regular complaints of hip pain, but made no further complaints of wrist pain. (Tab 7, at 575-621.) Plaintiff notes that Lickerman was in wrist restraints as of March 26, 1999 and claims that family members and hospital staff could not effectively observe his wrist condition. As a preliminary matter, the court notes that the record fully supports the use of restraints in Lickerman's case. It is undisputed that he kept trying to get out of bed and pull out his IV lines and tubes; that he was unable to follow instructions or maintain placement in a bed or chair; and that his mental state (Wernicke-Korsakoff syndrome and delirium tremens) and hip injury placed him at an elevated risk of hurting himself. In any event, the VA Hospital nurses checked the restraints every shift by placing fingers under them to ensure proper positioning, circulation, and skin condition. The Daily Protective Device Flow Sheets documenting this care regimen make no mention of any left wrist pain, swelling, deformity, or instability. (Tab 8, 11; Tr. 586-90.)

The absence of any general complaints from Lickerman regarding wrist pain is bolstered by the fact that he still did not complain while engaging in physical exercises. VA kinesiotherapist Michael Sullivan held Lickerman's wrist while conducting active range of motion exercises with Lickerman on April 9 and 12, and on April 13, Lickerman was able to place some amount of pressure on his wrists by holding onto a pick-up walker to stand up. Lickerman did not complain of wrist pain at that time, but only that he could not take a step due to hip pain. Lickerman similarly had no complaints of pain during his transport to Briar Place or upon admission to the nursing home on April 20. Dr. Shreenivas spent 40 to 45 minutes with Lickerman and found that he had upper extremity strength of 5 out of 5. Over the next two days, moreover, Briar Place therapists observed Lickerman engaging in grooming, bathing, and dressing skills, and recommended that he use a rolling walker and engage in pully exercises with wrist weights as part of his rehabilitation. The therapists also noted repeatedly that he was able to use both hands, and confirmed his ability to verbalize his wants and needs.

Plaintiff theorizes that all of these medical care workers – doctors, nurses, therapists, and paramedics from both Hines VA Hospital and Briar Place – somehow missed the fact that Lickerman's wrist was fractured. Based on the above evidence, the court does not find this theory credible. Nor is the court persuaded that Lickerman's pain medication and/or Wernicke-Korsakoff syndrome caused him to feel pain in his hip but not in his wrist. Dr. Hutchinson testified that pain medication is not selective and does not cause the pain in one fractured part of the body to stop entirely while allowing pain in another fractured area to continue. (Tr. 582.) Dr. Hutchinson also explained that Wernicke-Korsakoff syndrome does not cause patients to isolate hip pain from wrist pain. (Tr. 584.)

Dr. Sanders' contrary testimony on this issue was not persuasive. Specifically, when asked whether "somehow from the 27th [of March] to the 20th [of April] selectively that period the painkiller stopped [Lickerman] from reporting [wrist pain] and feeling [wrist pain]," Dr. Sanders

15

responded, "[t]hat *might* be the case." (Tr. 483) (emphasis added). *See, e.g., Reed v. Jackson Park Hosp. Found.*, 325 Ill. App. 3d 835, 844, 758 N.E.2d 868, 876 (1st Dist. 2001) ("Experts cannot base opinions on what may have occurred or what the expert believed might have happened in a particular case.") Notably, Dr. Sanders acknowledged that he has no expertise regarding mental conditions such as Wernicke-Korsakoff syndrome and their effects on pain. (Tr. 478-79.) Dr. Sanders also suggested that the Hines VA staff only took the time to treat Lickerman's primary complaint: "people are focusing on his hip pain at that time because that's his hospital diagnosis." (Tr. 481-82.) Dr. Sanders acknowledged, however, that when Lickerman complained of wrist pain in his first few days at the hospital, the VA staff properly recorded it. (Tr. 482-83.)

Plaintiff makes much of the fact that Briar Place has no record of a fall or accident sufficient to cause the fracture. Between April 25 and May 6, 1999, however, Briar Place has no record of anything except that Lickerman suddenly could not move his wrist on April 28, 1999. Even then, there is no record that the nursing home did anything about the wrist until VA Nurse Swiebocki reported a problem on May 6, 1999.[2] Significantly, Lickerman was no longer in restraints at Briar Place despite the fact that he remained a high fall risk and made repeated attempts to get out of bed. (Tab 23, at 431-32; Tr. 622-23; Swiebocki Dep., at 16-18.) To the extent Briar Place may have been negligent in its treatment of Lickerman, however, the United States cannot be held responsible. 28 U.S.C. §§ 1346(b), 2671; *Alinsky v. United States*, 156 F. Supp. 2d 908, 911 (N.D. Ill. 2001) ("As a matter of law, the United States may not be held liable for the negligent acts of . . . an independent contractor.")

---

[2] The court finds unreliable Briar Place's May 11, 1999 Nurses' Note recording that Lickerman purportedly told four nurses that the VA Hospital ignored his wrist injury. No one at Briar Place has admitted either to writing the note or to being one of the four nurses who spoke with Lickerman. (Tab 23, at 437; Tr. 517.)

The expert testimony regarding the May 6, 1999 x-ray similarly supports judgment in favor of the United States. Dr. Sanders based his opinion that Lickerman broke his wrist on March 23, 1999 in large part on the presence of callus on the May 6 x-ray. Significantly, however, Dr. Sanders made no mention of callus in his initial report. (Tab 35.) He only stated that he saw callus after Dr. Hutchinson issued his contrary report noting the absence of callus. Dr. Hutchinson convincingly explained at trial that the x-ray reflected crushed bone, and not callus. Indeed, Dr. Bednar similarly found "no or minimal" healing in the May 6 x-ray. (Bednar Dep., at 30.) Dr. Sanders also opined that the fracture was six weeks old based on the presence of osteopenia and cyst formation. He admitted, however, that old age, poor nutrition, and alcoholism – all of which apply to Lickerman – can also cause osteopenia. (Tr. 493.) In addition, Dr. Sanders testified at his deposition that callus and cyst formation typically appear "in an adult in two to three weeks." At trial, he testified that callus and cysts would form in Lickerman in four to six weeks, newly distinguishing between an "adult" and a "66-year-old adult." (Tr. 490.)

With respect to bone resorption, Dr. Hutchinson testified that the x-rays reflected two to three weeks of healing. (Tr. 648.) Dr. Sanders insisted that resorption does not begin until four to six weeks after a fracture, but Dr. Lee testified that based on the grossly unstable nature of the wrist, the fracture was more likely two weeks rather than six weeks old as of May 6, 1999. (Lee Dep., at 65-66; Tr. 488.) Dr. Bednar similarly testified that the fracture was at least two to three weeks old; beyond that assessment, he was unable to determine the exact age of the injury. (Bednar Dep., at 31, 53.)

Plaintiff has not established that the Hines VA staff was negligent in failing to x-ray Lickerman's wrist on March 23, 1999, or in its treatment of his wrist complaints. The evidence demonstrates that Lickerman likely suffered a wrist sprain, strain, or bruise in the March 23 fall, and the Hines VA staff properly noted and monitored his resulting pain, swelling, and tenderness during the first three days of his hospital stay. Lickerman did not present with a wrist fracture; indeed,

both experts agree that it is extremely rare for an individual to fracture both a hip and a wrist in the same fall. (Tr. 404, 570.) The hospital's treatment regimen was within the standard of care in all respects and did not proximately cause or contribute to Lickerman's subsequent wrist fracture, surgical procedures, or lengthy recovery period. *Cf. Meck v. Paramedic Servs. of Illinois*, 296 Ill. App. 3d 720, 722, 695 N.E.2d 1321, 1323 (1st Dist. 1998) ("Under the lost chance doctrine, proximate causation exists if plaintiff can show to a reasonable degree of medical certainty that defendant's conduct proximately increased the risk of harm or lost chance of recovery.")

## CONCLUSION

For the reasons stated above, the court enters judgment in favor of Defendant and against Plaintiff. The clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: MAR 3 0 2006

*Nan R. Nolan*
NAN R. NOLAN
United States Magistrate Judge